# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 20, 2001 Session

## STATE OF TENNESSEE v. MITCHELL SHEPHARD[1]

**Direct Appeal from the Criminal Court for McMinn County**
**No. 98-646     R. Steven Bebb, Judge**

---

**No. E2000-00628-CCA-R3-CD**
**July 3, 2001**

---

A McMinn County jury convicted the defendant of first degree murder in perpetration of aggravated child abuse and, following a sentencing hearing, sentenced the defendant to life without the possibility of parole. In this appeal, the defendant alleges (1) the evidence was insufficient to sustain his conviction; (2) a juror was improperly dismissed for cause; (3) prejudicial statements were made by a juror during *voir dire*; (4) evidence of the defendant's prior criminal conduct was improperly admitted; (5) prejudicial photographs of the victim were improperly admitted; (6) the state improperly commented on the defendant's failure to testify; (7) the jury was improperly instructed concerning the definition of "knowingly;" (8) the trial court failed to properly instruct the jury on lesser-included offenses; (9) the trial court improperly imposed a life sentence without the possibility of parole due to inadequate notice by the state; (10) the jury was improperly instructed concerning the minimum length of a life sentence; and (11) the verdict forms failed to comply with the statutory requirements. Although we affirm the conviction, we find that the trial court improperly instructed the jury during the sentencing phase that the minimum length of a life sentence is twenty-five years. Accordingly, we remand this case to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part;**

**Reversed in Part; Remanded for Resentencing**

JOE G. RILEY, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Charles M. Corn, District Public Defender, Cleveland, Tennessee (at trial); and John B. Nisbet, III, Cookeville, Tennessee (on appeal), for the appellant, Mitchell Shephard.

---

[1] The defendant's last name is spelled "Shephard" in some court documents and "Shepherd" in others. In accordance with our policy, we use "Shephard" throughout the opinion since this spelling is in the indictment.

Paul G. Summers, Attorney General and Reporter; Elizabeth Marney, Assistant Attorney General; Jerry N. Estes, District Attorney General; Amy F. Reedy and William W. Reedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant and Tammy Shephard (hereinafter "Tammy") were married in September 1997, and Tammy gave birth to the victim, Brandon Shephard, on May 5, 1998. She testified that the defendant was often angry following the victim's birth, and he thought that she spoiled the victim and held him too often. On a Saturday in September 1998, Tammy, her son Steven, the victim, and the defendant went to K-Mart. While in K-Mart, Tammy asked the defendant to take the victim into the restroom to change his diaper. She stated that the defendant exhibited disapproval with the undertaking, but he complied. Tammy described the victim's demeanor as "fine" before the defendant took him into the restroom, and she stated that he was not crying. She waited within sight of the restroom's entrance, and approximately five minutes later, the defendant exited the restroom holding the victim tightly. She stated the victim was crying to the point where he could hardly "gulp in breath;" his crying appeared uncontrollable; and his face was red. Tammy further stated that she had never seen the victim cry in such a manner. The defendant refused her request to tender the victim, so she pulled the victim from the defendant's arms, which angered the defendant. They left K-Mart, and the defendant was still angry while driving home.

After arriving at home, the victim began showing signs of sickness. The victim was very drowsy, had a fever, and vomited to the point that he "threw up everything that went into his stomach." Tammy testified that the victim slept throughout Saturday night and all day on Sunday, and although the victim remained drowsy and had a poor appetite, he ceased vomiting. After Tammy expressed concern for the victim's condition, the defendant stated that the victim "had the punies" and would be okay. On Sunday night, Tammy went to work at approximately 11:00 p.m., which left the defendant alone with the victim. The next time Tammy saw the victim was at approximately 4:00 a.m. at the hospital emergency room.

Karen Headrick, an employee of the Department of Children's Services, testified that she visited with the defendant and Tammy in the maternity ward of the hospital two days after the birth of the victim. During that visit, the defendant and Tammy agreed to a parenting plan in which the defendant was to have no unsupervised contact with the victim; the defendant was to attend anger management and parenting classes; and a Homemaker from the department would visit the home three times per week. During that meeting, the defendant was very cooperative and acknowledged that he had an anger management problem. However, the defendant and Tammy subsequently refused to comply with the conditions of the agreement, and the defendant threatened the Department of Children's Services with legal action. The department responded to the defendant's threat by filing an action in juvenile court, and on September 8th, prior to the hearing, the defendant agreed to

-2-

cooperate per the advice of his attorney. Nevertheless, the defendant again failed to comply with the conditions of the agreement, and Headrick next saw the defendant on September 28th at the children's hospital where the victim was on life support. She stated that the defendant exhibited no emotion at the hospital.

Gale Ernsting was the on-duty emergency room clerk at Athens Regional Medical Center during the evening of September 28th, when the defendant entered with the victim. She stated that the defendant casually walked inside the hospital and did not appear in a hurry. He had the victim on his shoulder, and it appeared the victim was sleeping. The defendant informed her that the victim had vomited and experienced difficulty breathing. While Ernsting was completing admittance forms, the defendant stated "[m]aybe you had better have a nurse come now to check it." When the nurse came, the defendant positioned the victim so Ernsting was able to view the victim's face, which Ernsting described as blue in appearance. Ernsting further testified that the defendant never exhibited any emotion.

Ben Javana Byrd was the triage nurse at Athens Regional Medical Center. Byrd testified that the victim was not breathing; he had no pulse; his face was blue; and his temperature was 93 degrees. During Byrd's conversation with the defendant, the defendant did not inquire about the victim's condition; however, he stated that the "baby-sitter said [the victim] spit[] up and I heard him gurgling." The defendant further inquired if Byrd was "going to call the police," because "in the past, I've been accused of abuse." Byrd testified that the defendant exhibited no emotional reaction after they regained the victim's pulse.

Kenneth Terry Bowers, a former detective sergeant with the Athens Police Department, testified that he interrogated the defendant at East Tennessee Children's Hospital. In the defendant's statement, he stated he was "really stressed out lately," and at approximately 2:00 a.m. the victim cried, which angered him. The defendant stated that he placed the victim back in his crib, "started throwing toys" at him, and then "accidentally hit him on the back of the head with a little TV." The defendant said the victim gasped for air a few minutes later, and he took the victim to the hospital. The defendant acknowledged having a problem for which he needed help.

Dr. Gary Gitschlag, a pediatric ophthalmologist, testified that he examined the victim at the hospital, and the victim suffered from a cerebral hemorrhage and an extensive bilateral hemorrhage in the back layer of both eyes. He testified that the bilateral hemorrhage was not due to an accident, and opined that the victim died due to "shaken baby syndrome."

Dr. Joseph Childs, a pediatrician, treated the victim at East Tennessee Children's Hospital. Dr. Childs testified that when he examined the victim, the soft spot of the victim's head was firm and his pupils were very small and exhibited little reaction to light. He explained that the condition of the victim's soft spot and pupils evidenced that the victim suffered brain damage. When Dr. Childs dilated the victim's eyes, he saw a large amount of blood over the victim's retina, evidencing a retinal hemorrhage. Dr. Childs stated that the victim appeared pale and blue with no external signs of trauma except one small bruise on the facial chin bone. The CAT scan revealed that there was blood

surrounding the surface of the brain. Dr. Childs testified that he diagnosed the victim with "shaken baby syndrome," and the injuries sustained by the victim could be caused only by "violent forces . . . that anyone observing it would immediately recognize this could cause great harm to the child."

Dr. Ronald Toolsie, a pathologist and the Bradley County Medical Examiner, testified that he performed an examination on the victim. He testified the victim had two fractured ribs on his right side, due to injuries that occurred within a period of days prior to death. Dr. Toolsie opined that the trauma which caused the broken ribs occurred on or about September 26, 1998, and that the fractures were a result of "the enormous pressure of squeezing." He further opined that there was a link between the victim's rib fractures and the shaken baby syndrome damage to his brain.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to sustain his conviction of felony murder. We disagree.

### A. Standard of Review

When an accused challenges the sufficiency of the evidence, this Court must review the record to determine if the evidence adduced during the trial was sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App.1996).

In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995).

The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *Id.* In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

**B. Analysis**

The defendant does not contest the conclusion that the victim's death was due to shaken baby syndrome. However, the defendant asserts that the evidence was insufficient to prove that he "knowingly" shook the child severely enough to cause his injuries.

A killing "committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse" is first degree felony murder. Tenn. Code Ann. § 39-13-202(a)(2). No culpable mental state is required "except the intent to commit [aggravated child abuse]." Tenn. Code Ann. § 39-13-202(b). Child abuse is the "knowing" treatment of a child in such a manner to inflict injury. Tenn. Code Ann. § 39-15-401(a). Aggravated child abuse is child abuse resulting in "serious bodily injury" and is a Class A felony if the child is six (6) years of age or less. Tenn. Code Ann. § 39-15-402(a)(1), (b). The "knowing" *mens rea* requirement for first degree murder in perpetration of aggravated child abuse refers only to the conduct element of treatment. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000).

Tammy Shephard testified that the defendant took the victim into the restroom at K-Mart and when he exited approximately five minutes later, the victim was crying so profusely that he was gulping for air. She explained that the defendant was upset because he was asked to change the victim's diaper; she had to pull the victim from the defendant's arms; and the defendant remained angry at her during their drive home.

The evidence was sufficient to support the guilty verdict. The jury could reasonably conclude that the defendant's treatment of the child was "knowing," since he was aware of the nature of his conduct. *See* Tenn. Code Ann. § 39-11-106(20). The jury could further conclude that this treatment resulted in the death of the infant.

## II. DISMISSAL OF JUROR FOR CAUSE

The defendant alleges he was prejudiced by the trial court's dismissal of a potential juror. In *voir dire*, the state inquired of the juror, "[s]hould the state prove Mitchell Shephard guilty of murder in the first degree, you would be called upon to sit in judgment and render a judgment. Can you do that?" The potential juror replied, "[t]he policy that I live my life by is judge not that thee be not judged. Does that answer your question?" The state further inquired, "[i]s that a no?" In response, the potential juror replied, "I think that's a no."

The trial court should discharge any potential juror who for any reason cannot perform the duties of a juror. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). The decision of a trial court excusing a juror for cause is subject to an abuse of discretion standard. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App.1989). The trial court excused the prospective juror because she indicated she could not follow the law. The trial court was well within its discretion to dismiss the juror.

## III. *VOIR DIRE*

The defendant claims that statements made by a juror during *voir dire* and the trial court's inadequate curing instruction entitle him to a new trial. We disagree.

During *voir dire* a juror inquired, "[i]s life forever, or is that 25 years?" Then, a second juror expressed his interest in the question by stating, "[y]eah." The trial court answered the question by stating, "you don't need to worry about that, that's a legislative thing. The punishment for first degree murder in the State of Tennessee is either death, or life without parole, or life. The legislature determines what life is, we can't worry about that." Following a bench conference, the trial judge again instructed the jury:

> One of the jurors said something about twenty-five years. We don't, number one, you don't need to worry about that because the legislature decides what life punishment is in the State of Tennessee. Sometimes it changes, and the parole board does things. We never know with absolute certainty what life is, but you shouldn't concern yourself with that.

Elsewhere in this opinion we conclude the trial court's jury instruction during the penalty phase of the trial relating to the meaning of a life sentence was inaccurate. However, we conclude the juror's question during *voir dire* concerning the length of a life sentence did not prejudice the determination of guilt. The question was a spontaneous remark from a juror and was in no way solicited by the state. Furthermore, we find that any potential error was cured by the prompt action of the trial judge. There is a presumption that the jury does not disregard the trial court's instructions. *See* State v. Nesbit, 978 S.W.2d 872, 885 (Tenn. 1998). The defendant has failed to overcome this presumption.

## IV. PRIOR CRIMINAL CONDUCT

The defendant alleges that his prior criminal conduct was erroneously admitted through the testimony of nurse Ben Javana Byrd and Department of Children's Services employee Karen Headrick. Defendant is not entitled to relief on this issue.

### A. Nurse's Testimony

Ben Javana Byrd was the triage nurse at Athens Regional Medical Center. On appeal, the defendant challenges Byrd's testimony concerning a statement made by the defendant in which he expressed concern over calling the police due to past allegations of child abuse. There was no objection at trial to this testimony. The failure to object contemporaneously to testimony constitutes a waiver of appellate review. *See* Tenn. R. App. P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). The issue is waived.

**B. Department of Children's Services Employee's Testimony**

The defendant also challenges Ms. Headrick's testimony concerning the defendant's problems with anger management and his involvement with the Department of Children's Services. The record reflects that the trial court held a pretrial hearing concerning Ms. Headrick's proposed testimony. At the conclusion of the hearing, the trial judge indicated he would subsequently determine admissibility but would not allow testimony concerning her conclusions about the defendant's "tenseness."

Defense counsel renewed his objection to this testimony just prior to Headrick's trial testimony. The trial court indicated that the witness would not be allowed to testify about the reasons for the referral to the Department of Children's Services upon the birth of the victim.

At trial, Headrick testified that after the victim's birth, she received a referral, met with the defendant and his wife, and drafted a parenting plan for them. A redacted copy of the defendant's parenting plan was admitted which stated that (1) the defendant would not have any unsupervised contact with the victim; (2) the defendant would not be the primary caregiver of the victim; (3) the defendant would complete parenting and anger management classes; and (4) the defendant and his wife would cooperate with the "Homemaker" assigned to them. Headrick further testified that the defendant conceded he had a problem with anger management. She also testified that he failed to comply with the plan.

On appeal, the defendant argues that Headrick's testimony was improper because it was unfairly prejudicial and improperly admitted under Tenn. R. Evid. 403 and 404(b). The state concedes that the trial court did not conduct the proper 404(b) analysis, but contends that "Ms. Headrick's limited testimony about her experiences with the couple" was properly admitted. We conclude a portion of this evidence was improperly admitted.

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

Tenn. R. Evid. 404(b) provides:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Although Rule 404(b) prohibits the introduction of evidence of other crimes or bad acts in order to show that the defendant acted in conformity with his bad character in committing the charged offense, the rule does authorize the admission of evidence of prior unlawful conduct if the evidence is relevant to an issue such as identity, motive, intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b), Advisory Commission Comments; State v. Electroplating, Inc., 990 S.W.2d 211, 223 (Tenn. Crim. App. 1998).

We review the trial court's decision to admit evidence under Rule 404(b) under an abuse of discretion standard, provided the trial court complies with the procedural requirements outlined in subparts (1), (2), and (3) of the rule. State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000). Here, the record does not reveal compliance with subpart (2) of the rule.

Although the reason for Headrick's visit to the defendant and his wife at the hospital two days after the birth of the victim was never explained to the jury,[2] the inference was unmistakable upon admission into evidence of the parenting plan. The parenting plan provided that the defendant would have no unsupervised contact with the victim and would not be the primary caregiver of the victim. It was, therefore, readily apparent to the jury that the defendant had engaged in some kind of previous misconduct in order to give rise to such a parenting plan. We first consider the relevance of the requirement that defendant have no unsupervised contact with the victim and not be the primary caregiver. Under the facts and circumstances of this case, we are unable to say that this evidence is relevant to identity, motive, intent or rebuttal of accident or mistake. Electroplating, Inc., 990 S.W.2d at 223. We further conclude that this evidence, which clearly inferred prior bad acts by the defendant, reflected that the defendant acted in conformity with his bad character in committing the instant offense. Such is prohibited by Rule 404(b). We also conclude the details of the parenting plan are irrelevant under Rule 402.

However, we conclude the defendant's statement to Headrick that he had an anger management problem is not excluded by Rule 404(b). Furthermore, the admission is relevant under Rule 401 as it relates to whether the inflicted injury was accidental. This statement was properly admitted.

---

[2]At the pre-trial hearing, Headrick testified that the defendant had a prior conviction for aggravated assault against his daughter by a previous marriage. Headrick testified that the purpose of the parenting plan was to "insure that this does not happen again."

We must next determine whether the erroneous admission of the parenting plan and testimony relating thereto constitutes harmless error. The evidence in the case was basically undisputed. The defendant did not dispute that he had shaken the baby, nor did he dispute that the baby died as a result of being shaken. The only issue was whether the defendant acted "knowingly." It was further undisputed that the defendant had an anger management problem, which is relevant to whether the defendant acted knowingly or whether the inflicted injury was accidental. We have further examined the final argument of the state, and it makes absolutely no reference to any prior misconduct by the defendant other than his relevant admission that he had an anger management problem. Irrespective of the evidence erroneously admitted, the jury could only conclude that the defendant knowingly and violently shook the child, and that death resulted. Accordingly, we find this to be harmless error.

## V. PHOTOGRAPHS OF THE VICTIM

The defendant contends that the trial court improperly admitted photographs of the victim. We disagree.

The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, the photograph must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

We, therefore, must first determine whether the photographs were relevant. As previously stated, relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

The admitted photographs of the victim were taken in the hospital and were relevant to illustrate the medical testimony concerning the diagnosis of shaken baby syndrome. The photographs were also relevant to rebut the defendant's pre-trial assertion that he accidentally hit the victim's head with a toy television. Furthermore, the pictures were not grotesque or inflammatory. The defendant has failed to prove that the trial court abused its discretion in admitting the photographs.

## VI. PROSECUTORIAL MISCONDUCT

The defendant contends that the assistant district attorney commented on the defendant's failure to testify during the state's closing argument. We disagree.

## A. Standard of Review

Closing arguments are an important tool for both parties during the trial process. Arguments must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. *E.g.*, State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994). Due to the importance of closing arguments, attorneys are usually given wide latitude in the scope of their arguments, *see* State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994), and trial courts, in turn, are accorded wide discretion in their control of those arguments. *See* State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995), *perm. to app. denied* (Tenn. 1995).

## B. Analysis

The defendant alleges the prosecuting attorney, after citing numerous pre-trial statements made by the defendant to others, improperly stated that the defendant never told the jury what happened. The defendant's allegations of improper remarks are unfounded. After reviewing the entirety of the state's closing argument, it is clear that the prosecutor's comments referred to the defendant's failure in his prior statements to reveal the truth of what he had done. The prosecutor was not commenting on the defendant's failure to testify.

## VII. <u>DEFINITION OF KNOWINGLY</u>

Next, the defendant challenges the jury instruction concerning the definition of "knowingly." The trial court instructed the jury as follows:

> Knowingly means with knowledge, and in a criminal proceeding means that the defendant knew what he was about to do, and, with such knowledge, proceeded to do the act charged. A person acts knowingly if that person acts with the awareness either that his or her conduct is of a particular nature, or that a particular circumstance exists.
>
> The requirement of knowingly is also established if it is shown that the defendant acted intentionally, which I have previously defined.

The defendant sought to add to the definition of knowingly that the conduct must be "reasonably certain to cause the result." The trial court denied the defendant's proffered instruction.

In State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000), our supreme court held that "the *mens rea* of 'knowing' refers only to the conduct elements of treatment or neglect of a child under the child abuse statute and . . . the child abuse offenses are not result-of-conduct offenses." Accordingly, the trial court correctly denied the defendant's requested instruction.

# VIII.  LESSER-INCLUDED OFFENSES

The defendant next alleges that reckless homicide and criminally negligent homicide are lesser-included offenses of felony murder, and the trial court erroneously failed to charge the jury with these lesser-included offenses.  We conclude the failure to charge these offenses was harmless error.

As noted by the trial judge, it was unclear at the time of this trial which, if any, offenses were lesser-included offenses of felony murder.  Recently, the Tennessee Supreme Court determined that facilitation of felony murder, second degree murder, reckless homicide and criminally negligent homicide are lesser-included offenses of felony murder.  State v. Ely, ___ S.W.3d ___, ____ (Tenn. 2001).  The court further re-emphasized that an instruction on a lesser-included offense should be given when there is evidence that "reasonable minds could accept as to the existence of the lesser-included offenses" and the "evidence is legally sufficient to support a conviction for the lesser-included offense."  *Id.* at ___ (citing State v. Burns, 6 S.W.3d 453, 469 (Tenn.1999)).  Finally, the court clarified that an erroneous failure to instruct on a lesser-included offense is a "constitutional error for which the State bears the burden of proving its harmlessness beyond a reasonable doubt." Ely, ___ S.W.3d at ___.

Applying Ely to the instant case, we must conclude that both reckless homicide and criminally negligent homicide are lesser-included offenses of felony murder.  Furthermore, a jury could reasonably conclude that the defendant consciously disregarded the "substantial and unjustifiable risk that [death would] occur," thus authorizing a conviction for reckless homicide. *See* Tenn. Code Ann. §§ 39-11-302(c), 39-13-215(a).  A jury could also reasonably conclude that the defendant's criminal negligence led to the death, thus authorizing a conviction for criminally negligent homicide. *See* Tenn. Code Ann. §§ 39-11-302(d), 39-13-212(a).  Accordingly, the trial court erred in not charging reckless homicide and criminally negligent homicide as lesser-included offenses of felony murder.

We must now determine whether this failure constituted harmless error beyond a reasonable doubt.  The trial court instructed the jury to first consider felony murder and if not guilty of that offense, then to consider aggravated child abuse of a child six years of age or less, a Class A felony, and if not guilty of that offense, then to consider child abuse of a child six years of age or less, a Class D felony.  Tenn. Code Ann. §§ 39-11-117(a)(1); 39-15-402(a)(1); 39-15-401(a).

Our supreme court has held that "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense ... the jury necessarily rejected all other lesser offenses." State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998).  In Williams, the defendant was charged and convicted of first degree murder.  The jury was instructed on first degree murder and second degree murder. *Id.*  In finding the failure to instruct the jury on voluntary manslaughter harmless, our supreme court stated,

> [T]he trial court's erroneous failure to charge voluntary manslaughter is harmless
> beyond a reasonable doubt because the jury's verdict of guilt on the greater offense
> of first degree murder and its disinclination to consider the lesser-included offense

of second degree murder clearly demonstrates that it certainly would not have
returned a verdict on voluntary manslaughter.

*Id.*

The Tennessee Supreme Court refused to find harmless error in <u>Ely</u> since the trial court did
not instruct on any lesser-included offenses. ___ S.W.3d at ___. However, the court distinguished
<u>Williams</u>, noting that the "[<u>Williams</u>] jury clearly demonstrated its disinclination to convict on any
lesser offenses, including voluntary manslaughter." *Id* at ___.

In the present case, the jury was instructed to consider the offenses of aggravated child abuse
of a child six years of age or less, a Class A felony, and child abuse of a child six years of age or less,
a Class D felony, if the jury found the defendant not guilty of felony murder. By convicting the
defendant of the highest offense of felony murder, the jury necessarily rejected the other offenses,
indicating its disinclination to consider any lesser charges. Accordingly, the trial court's failure to
instruct on reckless homicide and criminally negligent homicide was harmless beyond a reasonable
doubt.

## IX. <u>NOTICE OF INTENT TO SEEK LIFE WITHOUT PAROLE</u>

The defendant originally asserted in his brief that because no notice of intent to seek life
without parole appeared in the technical record, the trial court should have sentenced the defendant
to imprisonment for life when the jury found him guilty of felony murder. *See* <u>State v. Gilliland</u>, 22
S.W.3d 266, 275 (Tenn. 2000). The state conceded that notice was absent from the technical record.
However, we ordered the clerk to supplement the record with any written notices filed by the state.
The supplemental record contains a written notice of intent to seek life without the possibility of
parole filed November 6, 1998. The defendant's trial began on February 15, 2000.

It is now clear that written notice to seek life without the possibility of parole, as required by
Tenn. Code Ann. § 39-13-208(b), was properly and timely filed. We further note that the defendant
has now conceded this issue upon the filing of the supplemental record.

## X. <u>25-YEAR JURY INSTRUCTION</u>

The defendant asserts that the trial court committed reversible error by instructing the jury
during the sentencing phase concerning the minimum years of service a life sentence requires. We
agree.

The trial court instructed the jury during the sentencing phase that a "defendant who receives
a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant
has served at least twenty-five full calendar years of such sentence." We acknowledge that the trial

court in giving this instruction followed Tenn. Code Ann. § 39-13-204(e)(2), which provides "[t]he jury shall be instructed that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five full calendar years of such sentence." However, effective May 18, 1998, the General Assembly enacted Tenn. Code Ann. § 40-35-201(b) (Supp. 2000) which provides:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser-included offenses.

This amended statute applies to all trials occurring after May 18, 1998. 1998 Public Acts, Chapter 1041, § 2.

We have previously held that, under the amended statute, instructions to the jury in a first degree murder case in which the state is not seeking the death penalty is error. State v. Charles Ray Allen, C.C.A. No. M1999-00818-CCA-R3-CD, 2000 WL 1649507, at *7 (Tenn. Crim. App. filed November 3, 2000, at Nashville), *perm. to app. denied* (Tenn. 2001). In Allen, this Court, citing State v. Edward Pinchon, C.C.A. No. M1999-00994-CCA-R3-CD, 2000 WL 284071 (Tenn. Crim. App. filed March 17, 2000, at Nashville), *perm. to app. denied* (Tenn. 2000), found harmless error when the trial court instructed the jury that the state was not seeking the death penalty nor life without parole; thus, the penalty for first degree murder was a life sentence. In both Allen and Pinchon, the instruction was given to the jury when the state was not seeking the death penalty nor life without the possibility of parole and was actually an accurate instruction. The instruction was not given during the sentencing phase of a trial in which the jury had sentencing responsibilities.

The rationale of Allen and Pinchon would appear to apply to the sentencing phase of a first degree murder trial in which the state is seeking life without parole but not the death penalty, as it is not a capital offense. *See* Tenn. Code Ann. § 40-35-201(b) (forbidding jury instructions on possible penalties for offenses except for "capital crimes"). Regardless, we further conclude the jury instruction in this case was erroneous due to its inaccuracy.

The trial court incorrectly instructed the jury that a defendant who receives a sentence of imprisonment for life is eligible for parole after twenty-five years. The minimum release eligibility date for a life sentence imposed for first degree murder committed after July 1, 1995, is fifty-one years. Tenn. Code Ann. § 40-35-501(i); State v. Charles Golden, C.C.A. No. 02C01-9709-CR-00362, 1998 WL 518071, at *7 (Tenn. Crim. App. filed August 21, 1998). In fairness to the trial court, we

again recognize that the trial court gave the 25-year charge as it is stated in Tenn. Code Ann. § 39-13-204(e)(2).[3]

Just as in Golden, we are unable to conclude that the error was harmless in this case. The jury was responsible for imposition of a sentence of either life or life without the possibility of parole. *See* Tenn. Code Ann. § 39-13-204. We are reluctant to substitute our judgment for that of the jury when the jury was provided inaccurate information. The defendant was age 26 when he was incarcerated for this offense. If sentenced to life imprisonment, he would be at least 77 years old before being eligible for release. The inaccurate information led the jury to believe that he would be eligible for release at age 51. We are unable to conclude that the jury would still have chosen life without parole if the erroneous instruction had not been given.

Due to the inaccurate jury instruction, the defendant is entitled to a new sentencing hearing.

## XI.  JURY VERDICT FORMS

The defendant claims that the jury verdict forms failed to comply with statutory requirements. The verdict forms are not included in the trial record. It is the duty of the accused to provide a record which conveys a fair, accurate and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *see* State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Any issue associated with the verdict forms is waived.

## CONCLUSION

Finding the jury was erroneously instructed that the minimum length of a life sentence was twenty-five years, we reverse the defendant's sentence and remand to the Criminal Court of McMinn County for a new sentencing hearing; however, the defendant's conviction for first degree murder in perpetration of aggravated child abuse is affirmed.

_____
JOE G. RILEY, JUDGE

---

[3]In spite of the obvious conflict between Tenn. Code Ann. § § 39-13-204(e)(2) and 40-35-501(i), the legislature has still not amended Tenn. Code Ann. § 39-13-204(e)(2) (Supp. 2000). It is hoped that such an amendment will be made to avoid the inconsistency.